830 F.2d 1208
 Melvin T. WALKER, Plaintiff-Appellee,
v.
Dennis M. LUTHER, Warden, Daniel R. Lopez, Regional
Commissioner, and United States Parole Commission,
Defendants-Appellants.
Louis BOLDEN, Jr., Plaintiff-Appellee,
v.
Dennis M. LUTHER, Warden, Daniel R. Lopez, Regional
Commissioner, and United States Parole Commission,
Defendants-Appellants.
 Nos. 730, 731.
 Dockets 86-2342, 86-2356.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 26, 1987.
Decided Oct. 6, 1987.
 
 Barry K. Stevens, Asst. U.S. Atty., D. Conn., Bridgeport, Conn. (Stanley A. Twardy, Jr., U.S. Atty., D. Conn., New Haven, Conn., of counsel), for defendants-appellants.
 Joan C. Harrington, Bridgeport, Conn. (Koskoff, Koskoff & Bieder, P.C., Bridgeport, Conn., of counsel), for plaintiffs-appellees.
 John L. Pottenger, Jr., New Haven, Conn. (Stephen Wizner, Miriam Berkman, Mary A. McCarthy, Sally Zanger, Robert A. Solomon, Jerome N. Frank Legal Services Organization, New Haven, Conn., James B. Henly, Yale Law School Student Intern, of counsel) filed a brief for amicus curiae, Jerome N. Frank Legal Services Organization.
 Before NEWMAN, CARDAMONE, and WINTER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The question presented on the appeal is whether a prisoner should have his term of confinement determined by two separate parole authorities simultaneously exercising parole power over him. From the standpoint of parole fairness--which is Congress' purpose--this is not a situation where two heads are better than one. Instead, release rules that are reasonably expected to be consistently applied become confounded. Here the United States Parole Commission and the District of Columbia Parole Board exercise simultaneous parole powers over District of Columbia offenders. The District of Columbia Parole Board (D.C. Board) has general parole decisionmaking power over prisoners convicted of crimes under the laws of the District of Columbia (D.C.Code offenders or D.C. offenders), who are housed in D.C. prisons. See D.C. Code Ann. Sec. 24-204 (1981). The United States Parole Commission has similar parole power over offenders housed in federal prisons. See D.C.Code Ann. Sec. 24-209 (1981). Under D.C.Code Ann. Sec. 24-425, the Attorney General may assign D.C.Code offenders to incarceration either in federal institutions or in local D.C. prisons.[1] The sole issue to be decided is which standards the Commission must apply in exercising its authority over D.C. offenders in its custody.
 
 
 2
 Appellants, Dennis M. Luther, Warden of the Federal Correctional Institution at Danbury, Connecticut, Daniel R. Lopez, Northeast Regional Commissioner of the United States Parole Commission, and the United States Parole Commission, (collectively "the Commission"), argue that the Commission is authorized to apply its own federal parole guidelines. Conversely, petitioners Melvin T. Walker and Louis Bolden, Jr. maintain, as they did below, that the Commission must apply D.C. guidelines in making parole decisions. Consequently, petitioners--as inmates convicted under the laws of the District of Columbia, but serving their sentences in federal correctional institutions--claimed in the district court that their statutory and constitutional rights were violated when the Commission applied federal rather than D.C. parole standards in determining their parole eligibility. The United States District Court for the District of Connecticut (Zampano, J.) agreed, and on July 16, 1986 granted petitioners writs of habeas corpus, affording them new parole hearings in accordance with D.C. parole guidelines, 644 F.Supp. 76. We affirm.
 
 BACKGROUND
 
 3
 On July 13, 1983 petitioner Walker was sentenced in the Superior Court for the District of Columbia after pleading guilty to burglary in the second degree. He received an indeterminate sentence of 16 months to seven-years imprisonment and initially was confined at the Federal Correctional Institution (FCI) at Lorton, Virginia and later was transferred to the FCI at Danbury, Connecticut. The Commission conducted Walker's initial parole hearing at Danbury and, using federal parole standards, determined that he would be released in November, 1988. In June 1985 Walker filed a petition for a writ of habeas corpus alleging statutory and constitutional violations as a result of the Commission's application of federal parole standards to his parole release date.
 
 
 4
 On April 28, 1977 petitioner Bolden was sentenced in the District Court for the District of Columbia to five-years imprisonment for possession of stolen mail and alteration of a United States Treasury check. Paroled from that sentence in 1982, he was returned to federal custody for a parole violation in 1984. In August of that year the Commission conducted Bolden's parole revocation hearing and, using federal guidelines, determined that he would receive a presumptive parole on August 25, 1990. In June 1985 Bolden filed a petition for a writ of habeas corpus, challenging the Commission's authority to determine parole release dates under federal parole standards.
 
 
 5
 After consolidation of the two habeas petitions, the district court held that D.C.Code Sec. 24-209 requires the U.S. Parole Commission to apply D.C. parole standards and guidelines to D.C. offenders housed in federal prisons. Walker v. Luther, 644 F.Supp. 76, 80-81 (D.Conn.1986). The habeas court also decided that the application of the stricter federal parole procedures to those offenders violated their Fourteenth Amendment equal protection rights. Id. at 81. And finally, it concluded that the disparate treatment between male and female D.C. offenders also violated equal protection requirements. Id. Accordingly, it granted the habeas corpus petitions and ordered the Commission to give Walker and Bolden new parole hearings in accordance with D.C. parole standards.
 
 
 6
 Moving under Rule 59(e) of the Federal Rules of Civil Procedure, the Commission sought reconsideration or, in the alternative, clarification of the decision. On July 30, 1986 the district court denied the motion and ordered the Commission to hold new parole hearings under D.C. standards by September 1986. Pursuant to that order, the Commission held a new parole hearing for Walker on August 20, 1986 and, applying D.C. parole standards, granted him a parole release date of February 19, 1987. On August 22, 1986 the Commission held a similar hearing for Bolden, but denied him parole and scheduled a rehearing for November 1987. The Commission determined that though Bolden would normally be paroled in August 1986 under the D.C. guidelines, his case warranted a parole decision outside the guidelines under the D.C. "unusual circumstances" exception. See D.C.Mun.Regs., Title 28, Sec. 204.22 (1984).
 
 
 7
 Neither petitioner has been released on parole as a result of the Commission's most recent parole decisions. The Commission rendered them solely for the purpose of complying with the district court's order and reserved the right to rescind them should that order be reversed or vacated on appeal. The Commission has now appealed. We agree with the district court's statutory interpretation of Sec. 24-209. Because under our view of that statute petitioners were entitled to parole hearings under the District of Columbia standards, we need not reach or decide their constitutional claims.
 
 DISCUSSION
 I Language of Sec. 24-209
 
 8
 As always, an analysis of a statute begins by an examination of its language. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); United States v. Gaggi, 811 F.2d 47, 54 (2d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987). For, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).
 
 
 9
 D.C.Code Sec. 24-209 provides that the United States Parole Commission:
 
 
 10
 shall have and exercise the same power and authority over prisoners convicted in the District of Columbia of crimes against the United States or now or hereafter confined in any United States penitentiary or prison (other than the penal institutions of the District of Columbia) as is vested in the District Board of Parole over prisoners confined in the penal institutions of the District of Columbia.
 
 
 11
 D.C.Code Ann. Sec. 24-209 (1981) (emphasis supplied).[2] We read Sec. 24-209 as requiring the Commission to apply D.C. parole standards. It is significant that this section does not grant to the Commission the same power and authority over D.C.Code offenders that it exercises over U.S.Code offenders. Instead, the statute expressly states that the Commission has only the same power and authority "as is vested" in the D.C. Board. Because the D.C. Board itself is vested only with the power to apply D.C. parole statutes--and not federal parole statutes--the Commission is therefore also limited by the specific language of Sec. 24-209 to applying D.C. parole law.
 
 
 12
 Further, the fact that Sec. 24-209 gives the Commission "the same power and authority" over federally-housed D.C. offenders as the D.C. Board has over D.C.-housed D.C. offenders suggests a statutorily imposed parity between the two parole bodies that may only be achieved through the application of a uniform body of parole statutes and guidelines. In other words, if the D.C. parole guidelines required release of a D.C.Code offender on parole, the Commission's contrary action based on federal guidelines "would not seem to be an exercise of 'the same power and authority.' " Johnson v. Williford, 821 F.2d 1279, 1283 (7th Cir.1987). Thus, in order for the Commission to exercise only "the same power and authority" as that vested in the D.C. Board, it must apply D.C. guidelines.
 
 
 13
 Again, the statute provides that the Commission shall have "and exercise" the same power and authority as is vested in the D.C. Board. That language also implies that the Commission's and the D.C. Board's use of paroling power over D.C.Code offenders shall be the same. But, unless Sec. 24-209 is construed as requiring the Commission to apply D.C. statutory and regulatory parole standards, the Commission would be free to "exercise" different power in making its parole decisions. As a matter of statutory construction, statutes granting power to administrative agencies are strictly construed as conferring only those powers granted expressly or by necessary implication. See 3 N. Singer, Statutes and Statutory Construction Sec. 65.02 (Sands 4th ed. 1986). Under this rule, the Commission would be required to follow D.C. guidelines because Sec. 24-209 does not expressly or impliedly grant it the power to use federal parole criteria.
 
 
 14
 Finally, the D.C. Board is governed by its own parole guidelines established under the District of Columbia Administrative Procedure Act, see D.C.Code Ann. Sec. 1-1501, et seq. (1981), as it is by D.C. parole statutes. See Brown v. Lundgren, 528 F.2d 1050, 1053 (5th Cir.) ("[T]o the extent that the [federal] parole board establishes guidelines or procedures under the APA, the Board is as controlled by those rules and procedures as any statutory law."), cert. denied, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 283 (1976); Pendleton v. District of Columbia Bd. of Elections & Ethics, 449 A.2d 301, 305 (D.C.1982) (D.C. APA modeled on federal APA and federal judicial constructions are persuasive authority); see also D.C.Code Ann. Sec. 1-1510 (agency's failure to follow its own rules is subject to judicial review); Wolff v. McDonnell, 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974) (prison adjustment committee's discretion limited by "controlling regulations"). Hence, its own guidelines limit and delineate the power and authority vested in the D.C. Board and are therefore part of the grant of power to the Commission under Sec. 24-209.
 
 
 15
 Consequently, it follows that the language of Sec. 24-209 requires the Commission to apply D.C. standards in exercising its parole powers over D.C. offenders serving their sentences in federal prisons. Yet, since the meaning of Sec. 24-209 is at least arguably not free from doubt, it is necessary to consider its legislative history and other evidence of its import. See Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981) (ascertainment of statute's facial meaning need not end the inquiry); accord Train v. Colorado Pub. Interest Research Group, Inc., 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).
 
 II Legislative History of Sec. 24-209
 
 16
 Before 1932 there existed no separate D.C. parole law. Offenders convicted of crimes in the District of Columbia were governed by the federal parole system implemented by the Federal Parole Act, Act of June 25, 1910, ch. 387, 36 Stat. 819, which did not differentiate between them and other federal offenders with respect to sentencing, incarceration, and parole. Therefore, prior to 1932 parole decisions regarding D.C. offenders--whether incarcerated in federal or D.C. correctional institutions--were made exclusively by federal parole authorities using federal parole criteria. See H.R.Rep. No. 881, 72d Cong., 1st Sess. 2 (1932).
 
 
 17
 In 1932 Congress established the Board of Indeterminate Sentence and Parole for the District of Columbia (now the D.C. Board), Act of July 15, 1932, ch. 492, 47 Stat. 696 (1932 Act), thereby creating a separate, local law of sentencing and parole for the District of Columbia. Anticipating the expansion of D.C. prison facilities, see S.Rep. No. 674, 73d Cong., 2d Sess. 1-2 (1934) (reprinting letter of D.C. Commissioners), Congress hoped that D.C. offenders would be housed locally, allowing the District of Columbia to "in large measure assume responsibility for D.C.Code offenders." Cosgrove v. Smith, 697 F.2d 1125, 1130 (D.C.Cir.1983). The purpose of the legislation was to establish a separate parole system for "persons convicted of felonies in the District [of Columbia] courts." S.Rep. No. 450, 72d Cong., 1st Sess. 3 (1932). Understanding that "[u]nder existing law the Federal Parole Board ha[d] jurisdiction in cases involving District of Columbia prisoners," Congress planned to "relieve the United States Government of an increasingly heavy burden which the District officials feel would be more appropriately handled through local administration." Id.; see H.R.Rep. No. 881, 72d Cong., 1st Sess. 2 (1932).
 
 
 18
 Parole decisionmaking for offenders in the District of Columbia was changed under the 1932 Act in three important respects. (1) The Act authorized new indeterminate sentencing for D.C.Code offenders with minimum sentences not to exceed one-fifth of the maximum sentence. Sec. 3, 47 Stat. 696, 697 (current version at D.C.Code Ann. Sec. 24-203(a) (1981)) (In fact, those violators sentenced before the 1932 Act were also made eligible for parole after serving one-fifth of their maximum term, Sec. 9, 47 Stat. 696, 698-99, demonstrating Congress' desire to have all D.C.Code violators treated the same under the new parole guidelines). (2) It created the D.C. Board with paroling authority over prisoners incarcerated in D.C. facilities. Sec. 1, repealed by Act of July 17, 1947, ch. 263, Sec. 7, 61 Stat. 378, 379. (3) The Act established statutory standards of parole suitability to guide the new Board. Sec. 4 (current version at D.C.Code Ann. Sec. 24-204(a) (1981)).
 
 
 19
 After the Act's passage, the anticipated expansion of D.C. prison facilities did not occur. See S.Rep. No. 674, 73d Cong., 2d Sess. 1-2 (1934). The transfer of D.C. offenders to federal facilities not only continued, but became a necessity. The United States Department of Justice observed that as of September 1985 over 1,400 D.C. offenders were housed in federal facilities "because of shortages of space to house inmates in the District of Columbia system." H.R.Rep. No. 323, 99th Cong., 1st Sess. 5, 6 (1985) (Report of the Department of Justice, Office of Legislative and Intergovernmental Affairs). Overcrowding of existing D.C. penal institutions continues, see Washington Post, March 9, 1986, at B1, and therefore the need for federal housing of D.C.Code offenders persists.
 
 
 20
 The continued federal housing of D.C. offenders after the implementation of the 1932 Act created two significant problems. First, under federal law, prisoners were not eligible for parole until they had served one-third of their sentences, see Act of Jan. 23, 1913, ch. 9, 37 Stat. 650, compared to one-fifth of the prisoner's sentence under the 1932 Act. Because federal parole authorities refused to apply the new D.C. eligibility law to D.C. offenders in their custody, those offenders were paroled later than similarly situated D.C.-housed offenders. Because of that disparity, a D.C. offender challenged his continued detention in federal prison on the ground that it violated his rights since he had served more than one-fifth but less than one-third of his sentence and thus was eligible for parole under D.C., but not federal, law. The Fifth Circuit rejected this claim holding that "the authority of the new [D.C.] board and the system of parole which it was to supervise were confined to the penal institutions in the District of Columbia, and only persons therein confined were to be affected." Aderhold v. Lee, 68 F.2d 824, 825 (5th Cir.), cert. denied, 292 U.S. 633, 54 S.Ct. 718, 78 L.Ed. 1486 (1934). Because Sec. 24-209 came soon on the heels of this holding, some courts thought that Congress meant it to overrule Aderhold. See Johnson, 821 F.2d at 1284; Cosgrove, 697 F.2d at 1129; Bracey v. Hill, 11 F.Supp. 148, 149 (M.D.Pa.), aff'd, 77 F.2d 970 (3d Cir.1935); but see Cosgrove, 697 F.2d at 1142 (Bork, J., dissenting). The Commission itself considered this to be the case because, as explained later, it thereafter applied only the one-fifth D.C. standard to federally-incarcerated D.C.Code offenders.
 
 
 21
 Second, federally-housed D.C. offenders with indeterminate sentences were considered completely nonparolable by federal parole authorities due to their novel sentences. See S.Rep. No. 674, 73d Cong., 2d Sess. 2 (1934). Consequently, federal parole officials were depriving D.C. offenders incarcerated in federal facilities of the parole privileges provided by the 1932 Act. As a result, after 1932 D.C. officials doubted the legality of transferring offenders to federal facilities, but were unable to remedy the situation due to their lack of adequate space. Instead, they presented these concerns to Congress:
 
 
 22
 As Congress unquestionably intended [in the 1932 Act] that prisoners convicted in the District of Columbia should be entitled to parole, their confinement in a Federal penal institution, where they are deprived of the benefits of parole, would, therefore, be illegal.
 
 
 23
 S.Rep. No. 674, 73d Cong., 2d Sess. 2 (1934) (letter from District Commissioners).
 
 
 24
 In 1934 Congress amended the 1932 Act in order to remedy these two problems. Act of June 5, 1934, ch. 391, 48 Stat. 880; see Johnson, 821 F.2d at 1285 ("It was after it had become clear to the Board of Commissioners and Congress that a significant number of D.C.Code offenders could not serve their sentences in D.C. prisons that the 1934 amendment was proposed and passed."). The 1934 amendment--now codified at D.C.Code Ann. Sec. 24-209--is the statute at the heart of this appeal. As its place in the statutory sequence demonstrates, Sec. 24-209 was enacted by Congress "to clarify the parole status of D.C.Code offenders held in federal prisons," Johnson, 821 F.2d at 1284, to terminate the continued application of federal parole law in light of the 1932 D.C. reforms, and "to ensure that the benefits of penological reform which had been provided for D.C.Code offenders did not vanish when the offenders were committed to federal custody." Cosgrove, 697 F.2d at 1130.
 
 
 25
 Because these goals could only be achieved by requiring the Commission to apply D.C. standards, Congress passed Sec. 24-209 to displace federal parole standards with respect to federally-incarcerated D.C. offenders. See H.R.Rep. No. 1446, 73d Cong., 2d Sess. 2 (1934); S.Rep. No. 674, 73d Cong., 2d Sess. 2 (1934). The statute was designed to create the same parole eligibility for D.C. offenders housed in federal institutions and those housed in D.C. institutions by mandating the uniform application of D.C. parole statutes.
 
 
 26
 The Commission's own conduct demonstrates that such was its understanding of the new law. As soon as Sec. 24-209 was enacted, the Commission immediately ceased using the one-third federal parole eligibility standard and began applying the one-fifth D.C. standard. See generally Story v. Rives, 97 F.2d 182, 186 (D.C.Cir.), cert. denied, 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938). In fact, it continued to apply the D.C. standard until 1940, when the D.C. parole eligibility standard was changed to one-third of the maximum sentence. Act of June 6, 1940, ch. 254, Sec. 2, 54 Stat. 242 (current version at D.C.Code Ann. Sec. 24-203 (1981)).
 
 
 27
 If doubt lingers that Sec. 24-209 directs the Commission to apply D.C. parole standards, a comparison of that statute with other congressional directives dispels it. Elsewhere, when Congress wanted military offenders housed in federal prisons to be treated the same as civilian offenders, it provided so expressly. For example, when arranging for the placement of military offenders, it said
 
 
 28
 a sentence of confinement adjudged by a courtmartial or other military tribunal ... may be carried into execution by confinement in any [military prison] or in any penal or correctional institution under the control of the United States.... Persons so confined in a [nonmilitary prison] are subject to the same discipline and treatment as persons confined or committed by the courts of the United States....
 
 
 29
 10 U.S.C. Sec. 858(a) (1982). The phrase "discipline and treatment" has been interpreted to include parole eligibility. Koyce v. United States Bd. of Parole, 306 F.2d 759, 762 (D.C.Cir.1962); King v. Federal Bureau of Prisons, 406 F.Supp. 36, 38-39 (E.D.Ill.1976). Plainly, when Congress considered it essential that the standards of the incarcerating jurisdiction govern, it made that requirement readily discernible upon the face of the statute.
 
 
 30
 In contrast, Sec. 24-209 defines the Commission's scope of authority entirely in terms of the power and authority possessed and exercised by another agency, namely the D.C. Board. The choice of the different language persuasively argues that Congress had two different objectives. Federal standards control the treatment of court-martialed prisoners under Sec. 858(a), while D.C. standards govern the parole of D.C. offenders under Sec. 24-209. In fact, Sec. 858(a) suggests that Congress would have chosen other language had it wanted federal standards applied to D.C. offenders. If it was Congress' purpose to have federal parole standards apply to D.C. offenders incarcerated in federal prisons it would simply have provided--following the Sec. 858(a) model--that the Commission shall have and exercise the same power and authority over D.C. prisoners as it has over federal prisoners. The absence of such a provision strongly evinces a legislative aim to have D.C. standards govern.
 
 
 31
 This difference in the words used is also apparent in other federal parole statutes. Before 1976, for example, federal offenders incarcerated in state prisons were paroled under state parole standards pursuant to Sec. 9 of the Act of June 25, 1910, ch. 387, Sec. 9, 36 Stat. 819, 821, repealed by Parole Commission and Reorganization Act, Pub.L. No. 94-233, Sec. 2, 90 Stat. 219 (1976). In contrast to Sec. 24-209, Sec. 9 did not provide that a state's paroling body shall exercise the same authority over federal offenders as the Commission would exercise were they held in federal prison. Rather, like Sec. 858(a), Sec. 9 read:
 
 
 32
 [W]henever any person ... convicted of any offense against the United States ... is confined ... in any reformatory institution of any State ..., then ... such person ... shall be eligible to parole on the same terms and conditions and by the same authority ... as persons committed to such institutions by the courts of said State....
 
 
 33
 Sec. 9, 36 Stat. 821. Thus, in at least these two instances, Congress has used language different from that of Sec. 24-209 where it wanted the receiving jurisdiction's parole standards to govern.
 
 III Judicial Construction of Sec. 24-209
 
 34
 Current and contemporaneous judicial construction of Sec. 24-209 confirms our view that the statute requires the Commission to apply D.C. standards. One year after the section's enactment, a D.C. offender unsuccessfully claimed his commitment to federal prison was illegal because it deprived him of his parole rights under Sec. 24-209. Bracey v. Hill, 11 F.Supp. 148 (M.D.Pa.), aff'd, 77 F.2d 970 (3d Cir.1935). The court's rationale was that confinement in federal prison was legal because the statute entitled him to the privileges and rights afforded by D.C. parole law. Id. at 149. Two years later, the same petitioner sought relief claiming that his confinement in federal prison violated his D.C. parole rights. His claim was again denied, on the same basis as it had been before. Bracey v. Zerbst, 93 F.2d 8, 10 (10th Cir.1937).
 
 
 35
 A year later in Story v. Rives, 97 F.2d 182 (D.C.Cir.), cert. denied, 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938), a similar view was taken of Sec. 24-209. There, the petitioner argued that Sec. 24-209 and the 1932 Act prevented the Commission from supervising released D.C.Code offenders. Id. at 186. The court rejected that argument and held that Sec. 24-209 only guaranteed federally-housed D.C. offenders parole based on the same standards as D.C.-housed offenders. Id. Recognizing that the D.C. one-fifth standard would apply rather than the federal one-third requirement, the cited cases concluded that Sec. 24-209 required the Commission to apply D.C. parole laws. Thus, it appears to have been the settled judicial position after the adoption of Sec. 24-209 that D.C. parole practices would follow offenders placed in federal custody.
 
 
 36
 In Johnson, the Seventh Circuit recently was faced with the same issue as that before us today. It held that "[t]he 'same power and authority' language of Sec. 24-209 enables the U.S. Commission to make the parole-release determination for D.C.Code offenders housed in federal prisons but requires that body to employ D.C. laws and regulations in making such decisions." 821 F.2d at 1288; see also Ashby-Bey v. Meese, 821 F.2d 1288 (7th Cir.1987); Chatman-Bey v. Meese, 797 F.2d 987, 994-95 (D.C.Cir.1986) (federally-housed D.C. offenders must satisfy D.C. eligibility requirements); Bryant v. Civiletti, 663 F.2d 286, 290 (D.C.Cir.1981) (same); Boyd v. Luther, Civ. No. N-85-361 (D.Conn. April 28, 1986) (available on WESTLAW, DCT file) (Sec. 24-209 requires the Commission to use D.C. criteria for determining whether to apply for a minimum sentence reduction); Corbett v. Luther, Civ. No. B-84-529 (D.Conn. February 7, 1985) (same), aff'd in part, dismissed in part, 778 F.2d 950 (2d Cir.1985); Parnell v. Gunnell, Civ. No. B-84-254 (D.Conn. Aug. 9, 1984) (available on WESTLAW, DCT file) (Sec. 24-209 requires the Commission to apply D.C. standards when acting under D.C.Code Ann. Sec. 24-201(c)); Gates v. United States Parole Commission, Civ. No. 77-136 (M.D.Pa.1977) (Sec. 24-209 specifically grants federally-housed D.C. offenders the same privileges of parole as are accorded to D.C.-housed offenders) (cited in Cosgrove, 697 F.2d at 1132).
 
 
 37
 Consequently, in addition to its language and legislative history, decisions construing Sec. 24-209 hold that the Commission must follow D.C. standards when determining release on parole.
 
 IV The Commission's Arguments
 A. Deference to Agency View of Statute
 
 38
 Although this analysis has been set forth in some detail, the Commission has made two arguments that deserve further comment. It maintains that using federal parole regulations in determining release dates for D.C. offenders in its care constitutes a reasonable construction of its authority under Sec. 24-209, which is entitled to "great deference." While it is true that an interpretation of a statute by the agency primarily responsible for its administration is entitled to deference, see Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), nonetheless, " '[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.' " Immigration & Naturalization Serv. v. Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984).
 
 
 39
 In the case at bar, whether Sec. 24-209 requires the Commission to apply D.C. statutory and regulatory parole standards is "a pure question of statutory construction for the courts to decide." Cardoza-Fonseca, 107 S.Ct. at 1221. Moreover, it is apparent that in enacting Sec. 24-209 Congress planned that the same treatment would be accorded D.C. offenders wherever situated by parole decisions being consistently made on the basis of D.C. statutory and regulatory standards. The Commission's contrary view therefore is not entitled to deference and must be rejected. See, e.g., Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) ("In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose."); Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (Courts " 'are not obliged to stand aside and rubberstamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' ") (quoting NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)), amended, 392 U.S. 901, 88 S.Ct. 2049, 20 L.Ed.2d 1361 (1968).
 
 
 40
 The fact that the Commission has itself taken inconsistent positions with respect to Sec. 24-209 is an additional ground for refusing to accord deference to that administrative body. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." Cardoza-Fonseca, 107 S.Ct. at 1221 n. 30 (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). The Commission has taken at least three different stands on Sec. 24-209's meaning. Initially, it interpreted the statute as granting it plenary power over federally-housed D.C. offenders, thereby enabling the Commission to apply both federal statutory and regulatory parole law to determine release dates. See, e.g., Johnson, 821 F.2d at 1287; Walker v. Luther, 644 F.Supp. at 78. Next, it claimed in the district court in the instant case that Sec. 24-209 allows it to apply federal guidelines because they are "essentially the same" as D.C. guidelines. See United States Parole Comm'n, Rules and Procedures Manual 176 (1987). See also Cosgrove, 697 F.2d at 1133. And now, for the first time, on this appeal, the Commission construes Sec. 24-209 as obliging it to follow D.C. parole statutes, but not D.C. parole regulations. (The Commission also argued below that it was entitled to apply federal parole statutes to D.C. offenders). It is hard to embrace the Commission's claim of deference to its view of Sec. 24-209 when that view is shrouded in such a fog of uncertainty.
 
 
 41
 B. Commission Claims That District Court Regulatory Guidelines Not Binding
 
 
 42
 As earlier noted, the Commission further argues that even were it to concede that it is bound to apply D.C. statutory parole law, it is not bound to follow D.C. regulatory guidelines, but may instead elect to apply its own guidelines to implement the D.C. statutes. The Commission then claims that the current federal parole regulations may serve to implement D.C.Code Ann. Sec. 24-209 by defining suitability for the parole of D.C.Code offenders in its care. This claim is unpersuasive because the fact of the matter is that the Commission's parole regulations were promulgated to implement the federal parole statute. See, e.g., 51 Fed.Reg. 7,066 (1986); 47 Fed.Reg. 56,336 (1982); 42 Fed.Reg. 39,809 (1977) (each invoking the federal parole statute as the "authority citation" for the Commission's guidelines). The federal regulations themselves quote the text of 18 U.S.C. Sec. 4206--the federal parole eligibility statute--almost verbatim in describing the Commission's criteria for parole decisionmaking, but significantly, they contain no mention of Sec. 24-204, the D.C. parole eligibility statute. See, e.g., 28 C.F.R. Sec. 2.18 (1986). Hence, the Commission's claim that its regulations were somehow intended to implement D.C. parole statutes is simply wishful thinking.
 
 
 43
 Moreover, as the Commission's practice indicates, Congress has not differentiated between statutes and regulations in the parole area. As a general rule, persons convicted and sentenced for violating the criminal law of a jurisdiction receive parole decisions based on the law of that jurisdiction. For, "[i]n any practical analysis, parole consideration is a part of the law annexed to the crime," Ruip v. United States, 555 F.2d 1331, 1335 (6th Cir.1977), inasmuch as "parole goes directly to the length of time a defendant is to be incarcerated." Durant v. United States, 410 F.2d 689, 692 (1st Cir.1969). As a consequence, nearly all criminals are governed by the parole law of their sentencing jurisdiction, regardless of their situs of incarceration. State law offenders housed in federal institutions or in another state's penal facilities, federal law offenders incarcerated in state institutions, and territorial law offenders housed in federal mainland prisons all carry with them the parole suitability criteria of the sending jurisdiction. See Interstate Corrections Compact, Art. IV(f) (where receiving state is authorized by sending state to conduct the parole hearing, "the governing law shall be that of the sending state") (codified e.g., at N.Y.Correct.Law Sec. 104(f) (McKinney 1987)); 28 C.F.R. Sec. 2.16(a) (U.S.Code violator serving a sentence in a state institution "shall be eligible for parole by the Commission on the same terms and conditions ... as though he were confined in a Federal penitentiary...."); United States Parole Comm'n, Rules and Procedures Manual Sec. 2.2-01(a) (1987) (territorial law offenders "come under the jurisdiction of territorial parole authorities, not the U.S. Parole Commission, even if they are confined within the United States").
 
 
 44
 Thus, uniform practice as well as logic compel us to conclude that when Congress enacted Sec. 24-209 its purpose was to effectuate this general rule. Notably, the Commission has not chosen before to follow governing parole statutes and at the same time to ignore the accompanying regulations. Only in the case of D.C.Code offenders has the Commission posited such an illusory distinction. To adopt such a proposition would create unnecessary and unseemly anomalies in parole eligibility, inconsistent with Congress' aim that "parole ha[ve] both the fact and appearance of fairness to all." S.Rep. No. 369, 94th Cong., 2d Sess. 19, reprinted in 1976 U.S.Code Cong. & Admin.News 335, 340. We decline therefore to construe the statute in a way that would lead to such confusion in its application. See American Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982). We hold that it was Congress' plan that the parole of federally-housed D.C. offenders should follow the general rule that the sending jurisdiction's law--including both its statutes and its regulations--governs the release date of its offenders.
 
 CONCLUSION
 
 45
 The judgment of the district court is accordingly affirmed.
 
 
 
 [1]
 Specifically, Sec. 24-425 provides:
 All prisoners convicted in the District of Columbia for any offense ... shall be committed ... to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia.
 
 
 [2]
 Section 24-209 actually assigns "the same power and authority" over D.C. offenders to "[t]he Board of Parole created by Sec. 723a of Title 18, United States Code." Section 723a creating the old U.S. Board of Parole has been repealed, and the new United States Parole Commission has been established to replace it. Parole Commission and Reorganization Act, Pub.L. No. 94-233, 90 Stat. 219 (1976) (codified at 18 U.S.C. Secs. 4201-18, 5005-26 (1982)); see Cosgrove v. Smith, 697 F.2d 1125, 1130 n. 7 (D.C.Cir.1983). The Crime Control Act of 1984, Pub.L. No. 98-473, Title II, Secs. 218-35, 98 Stat. 1837, 2027-2034, amended by Pub.L. No. 99-217, 99 Stat. 1728, in turn abolishes the United States Parole Commission as of November 1, 1991, and directs the Commission in advance of that date, to set a release date for all prisoners within its jurisdiction. Id. at Sec. 235(b)(3)